## I. B. WARREN v. THE STATE.

*No. 7367. Decided June 20.*

**Murder.**—Evidence held insufficient to sustain a conviction of murder in the second degree.

APPEAL from the District Court of Bell. Tried below before Hon. W. A. Blackburn.

The opinion states succinctly the material facts of the case.

*Harris & Saunders* and *Saunders & Durrett,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE—This appeal is from a conviction of murder in the second degree, the punishment being assessed at five years in the penitentiary. The alleged murdered party was an infant child only three days old, begotten of appellant out of wedlock, but born a little more than a month from the time the appellant and the mother had been lawfully married.

There are five counts in the indictment. Two of them aver that the infant came to its death at the hands of the defendant by means unknown to the grand jury. The fourth count alleges: "That I. B. Warren, on or about the 16th day of May, A. D. 1890, in the State of Texas and County of Bell, did then and there with malice aforethought kill the infant Warren by torture, to-wit: the said I. B. Warren did then and there, on or about the night of the 15th of May, A. D. 1890, take the said infant Warren (the said infant Warren then and there being the same child that was born and given birth to by Mrs. Alice Warren on the 13th day of May, 1890, in said Bell County, Texas,) from the mother of said infant and from the house of Mrs. M. P. Coons; and on said night did deposit and leave said infant Warren in the yard of John Powers, in the said State and county, exposed to the prey of ants and flies, without food and without drink, which treatment was then and there torture to said infant Warren, and by means of which torture the said infant Warren, on or about the 16th day of May, A. D. 1890, in the said State and county, did die, said infant Warren being then and there a child of only a few days old and perfectly helpless. And the grand jurors aforesaid do say that the said I. B. Warren, of his malice aforethought, in manner and form aforesaid, did kill and murder the said infant Warren, against the peace and dignity of the State."

It is upon this count in the indictment, judging from the facts in the case, that the jury must have found the defendant guilty of murder in the second degree, as shown by their verdict. The validity of this conviction depends entirely upon the sufficiency of the evidence to warrant the finding and judgment. In his brief the Assistant Attorney-General says: "The evidence is not as strong as is desirable in such cases, but unless the court think it insufficient the judgment should be affirmed."

We will give as brief a resume of the facts in the case as the nature of the evidence will permit. As above stated, the defendant and his wife were married about the middle of April, 1890. They both knew her condition, that she was pregnant, when they married, but it seems they did not expect the child to be born until at least two months after the time at which it was born. They were boarding at the house of

Mrs. Coons, the wife's mother, when the parties were married, and also when the child was born. A few days before the birth of the child the mother was taken sick with flux, or some other disease, and continued quite ill until the afternoon of May 13, 1890, at which time she was confined and the child born. Dr. Ghent was the physician in charge of the case and was present when she was delivered. There were in the house at the time, besides the doctor, Mrs. Coons, the mother, and Mesdames Kramer and Waggoner, two sisters of the sick lady. These ladies were terribly distressed at the disgrace brought upon them by the birth of the child so early after the marriage of their daughter and sister, and Mrs. Coons especially was very abusive of the defendant for so disgracing her family. These parties, the women aforesaid, insisted that the child should be taken away, and gave the defendant no peace about the matter until he finally consented to do so. The child, according to the testimony of these women, was a seven months child and very feeble and sickly. The mother was too ill to nurse it, and the evidence shows that it never tried to nurse but once after its birth. That they tried to feed it, and it did not seem to be able to take nourishment. On the evening of May 15 the child had spasms and apparently died, but revived again about 5 o'clock in the evening, and Mrs. Coons says it was gasping and apparently dying the last time she saw it. She says she does not know whether it was dead or alive when the defendant took it from her house about 9 o'clock. Mrs. Waggoner, one of the State's witnesses, testified that she knew he was going to take the child away. He said the day before that he was going to take it to Temple, and would have it taken care of until his wife got well or was able to move. She says: "I don't know whether it was dead or alive when he took it away. The last time I saw it, it was gasping and looked like it was dying. That was about 6 or 7 o'clock, when I went to Dr. Adams'." Defendant himself testifying said: "I do not know whether the child was dead or alive when I took it away." On account of the disgrace attending the birth of the child so soon after the marriage of its parents, all of the parties agreed that the birth should be kept a secret, and they asked Dr. Ghent to keep it a secret, which he promised to do.

About 9 o'clock on the evening of the 15th, defendant went to the house for the purpose of getting the child and taking it away. He got it from Mrs. Kramer, who came out on the porch and delivered it to him wrapped in a blanket all ready for the trip. He got in his buggy and started for Temple, where he intended to place the child in the care of Mrs. Crittenden, whom he proposed to get to take care of it until his wife got well and able to move away, and until they could take care of and rear it themselves. He says that after he started toward Temple the child made no noise or movement of any kind until he had reached a point about three miles beyond the river from Belton, when

one wheel of the buggy ran over a stump and turned the buggy over on one side, and he then felt the baby jump in his arms.  He says: "I stopped the horse, laid the child down on the seat of the buggy, got out and hitched the horse.  I then examined the child and found that it was dead and cold.  When I left Mrs. Coons' house with the child I thought it was alive, but afterward I believed it was dead when Mrs. Kramer gave it to me, and that they (she and Mrs. Waggoner and Mrs. Coons) knew it was dead, and got me to start to Temple with it, as I did, to get it out of the house and thus save themselves a public burial of the child."  He says he stopped at least half an hour studying what to do with the child, and at last concluded to bring it back to Belton and bury it in the graveyard.  It must have been 12 o'clock when he got back to Belton, and he says: "I then took the body of the baby and walked over to South Belton cemetery and started to leave the child there until morning and get somebody to go over and dig its grave and bury it; but thinking about it for awhile, I was afraid some person would come to the cemetery early in the morning and find it before I had it buried.  Thinking this, I took it up and carried it across the street, got over the fence and carried it a little ways inside and laid it under the side of a cedar bush and broke off a few twigs and laid across the body.  I put the child, I suppose, fifty or seventy-five yards from the corner of the cemetery.  Next morning I got a buggy and drove over to the cemetery.  [This fact was established by the testimony of other witnesses.]  I intended to get the body from where I had put it and bring it down to Mr. Perry's, have him make a coffin for it and bury it openly.  As I drove up in sight of the place I was astonished to see that I had put the child right up close to Mr. Powers' house.  I drove to the corner of the cemetery, intending to hitch to the fence and get over into Powers' yard and get the body, but as I started to get out of the buggy I saw a lady standing near the edge of Powers' gallery, and a bundle, in which I thought the baby was wrapped, lying on the edge of the porch at her feet.  When I saw that I became frightened, and drove by the cemetery and back to town, expecting that something would be heard about the finding of the body."  This was on Friday morning, May 16.  It seems that the child's body was not discovered until Monday, May 19, when it was found within about thirty steps of Mr. Powers' house in his yard, and was wrapped up and in the condition above described by the defendant. Mr. Powers says that "on Thursday night, May 15, I slept out on my gallery and was awakened and my attention attracted by something." This was the night the defendant says he placed the body in the yard near Powers' house.  Mr. Powers says he examined the body of the child and saw no marks of violence on it.  It was a male child and right young.  That when found large red ants were about it, and the sun would shine on it during the day.  There was a good deal of cedar

brush and high weeds where the child was found, and it could not have been seen from the house. The house and lot are just across the street from the South Belton cemetery, the house being about seventy-five yards from the cemetery. The finding of the body created great excitement and indignation, and the community was stirred up and the feeling ran pretty high against the supposed unknown murderer of the child. Defendant said : "I learned Tuesday morning that I was suspected of having killed the baby, and on Tuesday evening I told some of my friends about the matter, and they advised me to leave Belton at once, as they thought my life would be in danger if I staid. I left on Tuesday evening and went to Temple, from there to Waco and from there to Dallas, where I staid with my brother, who lived at Dallas, some week or ten days, until I was arrested and brought back to Belton, where I have been in jail ever since."

This is in brief a substantial statement of the facts as they appear in the record before us. This evidence we do not believe is sufficient to establish the defendant's guilt of the murder of his child. Defendant never denied the paternity of the child, and it seems that he was not disposed on his own account to conceal its birth, but that he was induced and agreed that its birth should be kept secret by the earnest solicitations and abuse of his mother-in-law and sisters-in-law, and that on their account alone he consented to the concealment and taking away of the child from Belton. His own statement of the transaction is corroborated by other testimony in its most material features.

In our opinion the preponderance of the evidence goes to show that instead of his having murdered the child or having tortured it to death, it was in fact dead when he received it from Mrs. Kramer at the time he started to carry it from Belton to Temple.

Because the evidence in our opinion is wholly insufficient to support the verdict and judgment, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.